**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

T.H., an individual,

Plaintiff,

v.

G6 HOSPITALITY, LLC;

G6 HOSPITALITY IP, LLC;

G6 HOSPITALITY PROPERTY, LLC;

G6 HOSPITALITY PURCHASING, LLC;

G6 HOSPITALITY FRANCHISING, LLC;

MOTEL 6 OPERATING, L.P.; and

SAR HOSPITALITY LLC

d/b/a MOTEL 6 TOLEDO,

Defendants.

Civil Action No.: _______________

JURY TRIAL DEMANDED

## PLAINTIFF'S COMPLAINT

COMES NOW Plaintiff T.H., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

## INTRODUCTION

1. This action for damages is brought by T.H. ("Plaintiff"), a survivor of sex trafficking, under the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud and coercion by her traffickers to have sex with sex buyers at Defendants' subject hotel, located at 5335 Heatherdowns Blvd, Toledo, OH 43614, from approximately the summer of 2018 through and inclusive of April 2025.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. will collectively be referred to as "G6," "G6 Defendants," or "Franchisor Defendants." Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 located in Toledo, Ohio (the "Subject Hotel").

4. SAR HOSPITALITY LLC is herein referred to as the "Franchisee Defendant." Upon information and belief, the Franchisee Defendant owned, operated, or co-operated, controlled, and/or managed the Motel 6 Toledo located in Toledo, Ohio through the G6 franchising system. Upon information and belief, Franchisee Defendant acquired the Subject Hotel by limited warranty deed recorded on or about January 12, 2015, from G6 Hospitality Property, LLC, and owned the Subject Hotel throughout the period during which Plaintiff was trafficked.

5. Section 1591 of the TVPRA criminalizes sex trafficking of adults by force, fraud or coercion. See 18 U.S.C. § 1591. Separately, §1595 of the TVPRA provides individuals who are victims of sex trafficking with a civil remedy against the traffickers or the beneficiaries of the sex trafficking crime. See 18 U.S.C. §1595(a). More specifically, §1595 provides for three distinct causes of action: (1) a claim against the trafficker who directly violated §1591(a)(1) — a criminal statute; (2) a beneficiary claim against the trafficker who directly violated §1591(a)(2) — a criminal statute; and (3) a beneficiary claim against a civil defendant who did not violate §1591, but who "knowingly benefit[ed], financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a); the subject lawsuit is applicable, in part, to prong three, i.e. a beneficiary claim against civil defendants.

## PARTIES

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff's name and address are not contained in this Complaint to protect the safety, privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

7. Plaintiff T.H. is a resident of Ohio.

8. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

9. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

10. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas. Upon information and belief, the Subject Hotel was owned by Defendant Motel 6 Operating, L.P., which conveyed it to Defendant G6 Hospitality Property, LLC by limited warranty deed recorded on or about November 7, 2012; G6 Hospitality Property, LLC itself owned the Subject Hotel until on or about January 12, 2015, when it conveyed the Subject Hotel to Franchisee Defendant, after which the G6 Defendants continued to brand, control, and derive revenue from the Subject Hotel as a Motel 6 through the G6 franchising system.

11. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

12. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

14. Defendant SAR HOSPITALITY LLC is, upon information and belief, a for-profit limited liability company organized under the laws of the State of Michigan with its principal place of business in Toledo, Ohio. Upon information and belief, said Defendant owned, operated, controlled, and/or managed the Motel 6 Toledo located in Toledo, Ohio through the G6 franchising system during the period in which Plaintiff was trafficked.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Eastern District of Texas, and all Defendants are residents of this District for venue purposes.

17. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Therefore, each is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

18. Franchisee Defendant SAR HOSPITALITY LLC is an entity that, pursuant to 28 U.S.C. § 1391(c)(2), is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction with respect to the civil action in question. As set forth herein, Franchisee Defendant is subject to personal jurisdiction in the Eastern District of Texas by virtue of its purposeful contacts with Texas and with this District through the G6 franchising venture, and is therefore a resident of the Eastern District of Texas for purposes of § 1391(b)(1). Accordingly, all Defendants are residents of this District, and at least one Defendant resides in the Eastern District of Texas, such that venue is proper in this District under § 1391(b)(1).

19. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising venture between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated — occurred, in substantial part, in Texas and in the Eastern District of Texas.

20. Plaintiff's claims against Franchisee Defendant arise out of Franchisee Defendant's contacts with Texas through Franchisee Defendant's relationship with the G6 Defendants, which have their principal place of business in the Eastern District of Texas.

21. Franchisee Defendant's participation in a venture with the G6 Defendants operating the subject motel occurred, in substantial part, in Texas because:

    (a) upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

(b) on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

(c) on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

(d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

(e) on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like T.H.;

(f) on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

(g) on information and belief, Franchisee Defendant was required to attend training and meetings in Texas;

(h) the G6 Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects from their principal place of business in the Eastern District of Texas;

(i) on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(j) on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

(k) upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas;

(l) upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in Texas;

(m) on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the Texas franchising agreement;

(n) on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

(o) Franchisee Defendant's operation of the subject motel was controlled and/or influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(p) on information and belief, Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee Defendant to use when operating the subject motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

(q) on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

### I. T.H. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.

22. From approximately the summer of 2018 through and inclusive of April 2025, Plaintiff T.H. was trafficked, on a recurring basis, at the Subject Hotel by her traffickers. Under the control of her traffickers, T.H. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

23. Plaintiff was trafficked by her trafficker, Sonny, who operated a commercial sex trafficking enterprise at the Subject Hotel together with a second trafficker, Charles (also known as "Chuck"), now deceased, who was present at the Subject Hotel during the trafficking and participated in the enterprise, and, at times, other individuals who assisted Sonny.

Plaintiff's traffickers also dealt controlled substances, including crack cocaine, on and around the subject premises.

24. Sonny recruited Plaintiff in or about the summer of 2018 by posing as a romantic partner. Shortly after the relationship began, at a hotel room, Sonny told Plaintiff that she would be required to have sex with another man for money, and Plaintiff's trafficking began. Sonny imposed a daily quota of at least $500 on Plaintiff and confiscated all proceeds of the commercial sex acts. Plaintiff was trafficked at the Subject Hotel alongside other women being trafficked by Sonny, the precise number of whom is presently unknown to Plaintiff.

25. In order to induce T.H. by force, fraud, and coercion to engage in sex with sex buyers at Defendants' hotel, her traffickers used various means to do so including:

(a) Sonny was repeatedly and brutally violent with Plaintiff during the trafficking period, including beating her, striking her in the face with a firearm, stabbing her, attempting to cut her throat, and burning her with cigarettes — leaving visible injuries and permanent scars, and requiring repeated hospital treatment;

(b) her traffickers instilled in T.H. the fear of severe bodily injury if the traffickers' directives were not complied with;

(c) Sonny controlled Plaintiff through drugs and alcohol — providing controlled substances including cocaine and ecstasy, covertly placing drugs into Plaintiff's drinks, and compelling her to use drugs, including heroin;

(d) Sonny's possession of a firearm, including in the subject hotel rooms — a firearm with which he struck Plaintiff in the face;

(e) the confiscation of Plaintiff's identification, phone, wallet, and money, at times leaving Plaintiff alone in hotel rooms with nothing; psychological coercion; and

(f) other means of force, fraud, and coercion used by the traffickers to induce her to have sex with sex buyers at the Subject Hotel.

26. T.H. was compelled to engage in commercial sex acts with multiple sex buyers at the Subject Hotel. At times, Plaintiff was made to pick up sex buyers in the front lobby of the Subject Hotel — including in the direct presence and view of the Subject Hotel's manager

— and bring them to the subject rooms. At times, the traffickers used two (2) rooms at the Subject Hotel, directly next to each other, in connection with the trafficking.

27. Rooms used for the trafficking of Plaintiff at the Subject Hotel were booked by her traffickers, or at their direction — including, at times, through the Booking.com online travel agency platform using an account in Plaintiff's name — with such reservations, upon information and belief, processed through the centralized reservation and payment systems operated by the G6 Defendants. Rooms were rented for extended stays of approximately three (3) to thirty (30) days at a time, paid for at times in cash and at times by card, including on a day-by-day basis; at times the rooms were booked in Plaintiff's name using her credit card at Sonny's direction, and at times Sonny directed other women to rent the rooms.

28. T.H.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on T.H.'s appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that T.H. was being continually subjected to coercion, control, and exploitation.

29. Plaintiff's trafficking ended in or about April 2025, when Sonny was arrested in connection with shooting another woman — an individual known to Plaintiff — enabling Plaintiff to escape. Sonny subsequently pleaded guilty to attempted felonious assault with a firearm specification and was sentenced to prison.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

30. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of T.H.

31. Sex slavery is pervasive in the United States, and hotels are the primary place where it happens. For years, sex traffickers have been able to reap their profits with little risk when operating within hotels. In 2014, 92% of calls received by the National Human Trafficking

Hotline involved reports of sex trafficking taking place at hotels. Hotels have been found to account for over 90% of commercial exploitation of children.

32. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

33. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

34. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to: individuals showing signs of fear, anxiety, tension, submission, and/or nervousness; individuals showing signs of physical abuse, restraint, and/or confinement; individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way; individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior; individuals lacking freedom of movement or being constantly monitored; individuals avoiding eye contact and interaction with others; individuals having no control over or possession of money or ID; individuals dressed inappropriately for their age; individuals having few or no personal items; individuals appearing to be with a significantly older "boyfriend" or in the company of older males; drug abuse or frequent use of party drugs such as methamphetamines, cocaine, and marijuana; possession of bulk sexual paraphernalia such as condoms or lubricant; possession or use of multiple cell phones; and possession or use of large amounts of cash or pre-paid cards.

35. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

36. Toolkits specific to the hotel industry have been developed which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

37. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex activity in their hotels were in fact signs of sex trafficking.

38. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

39. The most effective weapon against sexual exploitation and human trafficking is education and training. The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Hotel employees who have undergone training are more aware of trafficking when it happens and are more willing to report it than those who have not been trained. If hotel companies do nothing to raise awareness or to prevent trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place.

40. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a decision to continue generating revenue while failing to take reasonable steps to identify and prevent sex trafficking.

41. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

**III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.**

42. Defendants' actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has known, since well before T.H.'s trafficking, that sex trafficking was ongoing at Motel 6 properties including the Subject Hotel.

43. G6 branded properties include both Motel 6 and Studio 6 properties.

44. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.

45. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles. G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

46. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

47. G6's hotels are strategically located close to airports, freeways, and other thoroughfares making them attractive venues for trafficking and compelled prostitution. The Subject Hotel is itself located in close proximity to major thoroughfares, including the Ohio Turnpike (Interstates 80/90), off of which the Subject Hotel is located.

48. Scores of news stories from across the United States highlight G6's facilitation of sex trafficking and establish that Defendants knew, or should have known, of the use of G6 branded hotels for sex trafficking. Among notable incidents involving the use of Motel and Studio 6 hotels for sex trafficking: in late 2003, a trafficker operated a sex trafficking

venture at a Motel 6 in Connecticut; in April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio — the very Subject Hotel at issue in this action; in approximately September 2011, sex traffickers sold minors for sex at a Motel 6 in Toledo, Ohio; from approximately 2012 through October 2014, two men engaged in criminal sex trafficking of children at a Motel 6 in Harvey, Illinois; in December 2012, the FBI investigated human trafficking at a Motel 6 in Madison, Alabama; in December 2012, the Orange County Human Trafficking Task Force busted a criminal enterprise selling women for sex out of a Motel 6 in Anaheim, California; in March 2014, a trafficker was charged with selling a seventeen year old girl for sex at a Motel 6 in Roseville, Minnesota; in March 2015, a seventeen year old girl was rescued from a Motel 6 in North Charleston, South Carolina by DHS special agents after being sold for sex, beaten, and starved; in March 2015, two men were arrested for sex trafficking a fifteen year old girl at a Motel 6 in Austin, Texas; over a fourteen month period ending in approximately April 2015, a Motel 6 in Warwick, Rhode Island had seventy-five arrests for crimes including sex trafficking; and in June 2015, a married couple was indicted for sex trafficking minor children out of a Motel 6 in Everett, Washington.

## IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.

49. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there. The G6 Defendants' knowledge of and connection to the Subject Hotel is further reflected by the fact that the Subject Hotel was owned by Defendant Motel 6 Operating, L.P. and then by Defendant G6 Hospitality Property, LLC itself until on or about January 12, 2015, when it was conveyed to Franchisee Defendant.

50. The Subject Hotel itself has a documented history of sex trafficking and commercial sex activity known to Defendants. In November 2010, five Toledo residents were indicted on federal sex trafficking charges arising from a venture that, beginning as early as 2007, recruited women and minors for prostitution and used rooms at the Subject Hotel — including, per the indictment, several rooms in April 2009 — for that commercial sex

activity; the ring's leader was convicted and sentenced in 2013 to fifteen (15) years in prison. In November 2022 — during the very period in which Plaintiff was being trafficked at the Subject Hotel — two men were arrested on felony charges of promoting prostitution after a woman was transported to the Subject Hotel for commercial sex — one of whom was arrested at the Subject Hotel itself.

51. Publicly posted guest reviews of the Subject Hotel published during the period of Plaintiff's trafficking further evidenced, and provided Defendants with notice of, the criminal activity and conditions at the Subject Hotel. Among them: a verified guest review posted to Booking.com — the very online travel platform through which rooms used for Plaintiff's trafficking were, at times, booked — upon information and belief published during the relevant period, described the Subject Hotel as "a hooker and drug hole"; a guest review of an October 2023 stay reported that, upon the guest's check-in, a police officer was at the front desk of the Subject Hotel reviewing video surveillance footage; a guest review of a November 2019 stay reported bedsheets soiled with blood and other bodily fluids, and reported that front desk staff refused to remedy or even acknowledge the problem, stating that the soiled linens were "what we consider clean" and remarking of the blood stains that they looked "fresh"; and another guest review of a November 2019 stay reported that the guest room door could be opened from the outside without a key card and that the deadbolt was broken, with front desk staff indifferent to the security failure. Upon information and belief, the Defendants collected, monitored, and analyzed guest reviews of the Subject Hotel, including the foregoing, and thereby knew or should have known of the criminal activity, including commercial sex activity, and the security and housekeeping failures, ongoing at the Subject Hotel during the period in which Plaintiff was trafficked there.

52. Upon information and belief, Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on:

(a) the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) the Defendants' collection and monitoring of customer surveys and complaints;

(c) the Defendants' regular inspections of the hotel property;

(d) information provided to Defendants by law enforcement; and

(e) other sources of information available to Defendants.

53. All knowledge from the staff at the Subject Hotel is imputed to G6.

**V. Defendants knew T.H. was being trafficked at the Subject Hotel because of the apparent and obvious "red flags" of sex trafficking.**

54. During the period that T.H. was trafficked at the Subject Hotel, there were signs obvious to Defendants that Plaintiff's traffickers were engaged in sex trafficking on the subject premises:

(a) Steady foot traffic of sex buyers through the front lobby of the Subject Hotel to the subject rooms to have sex with T.H. — including times when Plaintiff was made to pick up the sex buyers in the lobby itself, in the direct presence and view of the Subject Hotel's manager and staff;

(b) Plaintiff's trafficker physically abused her throughout the trafficking period, leaving visible injuries, including bruising and scarring, that were apparent to hotel staff and others;

(c) T.H. would, at times, walk around the Subject Hotel's grounds in sexually provocative and explicit clothing, with visible bruising, and visibly under the influence of drugs, and would, at times, interact with Defendants' staff in that condition;

(d) Plaintiff's traffickers actively used and distributed controlled substances on the subject premises — including by selling drugs directly to the manager of the Subject Hotel, an individual known to Plaintiff as "Ahmed," whom Plaintiff personally witnessed purchasing drugs from her trafficker;

(e) Plaintiff's traffickers, at times, used two (2) rooms directly next to each other at the Subject Hotel in connection with the trafficking of Plaintiff and other victims;

(f) Inside the hotel rooms used for Plaintiff's trafficking there were suspicious items including large numbers of condoms in the trash, sexual lubricant, sex toys, a pistol, and drugs, including crack cocaine, which were observed, or should have been observed, by hotel staff, including housekeeping staff who entered and serviced the subject rooms;

(g) Smoke detectors in the rooms used for Plaintiff's trafficking were removed, or covered with plastic bags;

(h) Large numbers of male visitors came to the front desk of the Subject Hotel asking for Plaintiff or for her trafficker;

(i) While on the subject premises, sex buyers paid Plaintiff's trafficker directly, in cash, for sex with Plaintiff;

(j) Plaintiff was advertised by her trafficker for commercial sex acts on online platforms, including Tagged and Skip the Games, and via explicit photographs posted to Facebook, with sex buyers responding by coming directly to the Subject Hotel;

(k) Upon information and belief, the manager of the Subject Hotel maintained a personal friendship with Plaintiff's trafficker and engaged in his own commercial dealings with the trafficker, purchasing controlled substances from him on the subject premises, giving Defendants' management direct, first-hand knowledge of the trafficker's criminal enterprise operating at the Subject Hotel;

(l) Rooms used for the trafficking at the Subject Hotel were booked by Plaintiff's traffickers, or at their direction, on a repeated basis — including, at times, through the Booking.com online travel agency platform using an account in Plaintiff's name;

(m) Plaintiff was trafficked at the Subject Hotel alongside other victims by the same traffickers operating in concert, indicia of an organized, multi-victim commercial sex trafficking operation;

(n) Other commonly known sex trafficking red flags which Defendants knew or should have known of had anti-trafficking measures been timely and properly implemented at the hotel.

55. Defendants' staff witnessed and observed on a regular and frequent basis signs and indicators of sex trafficking including items set forth in the preceding paragraph.

56. When being trafficked at the Subject Hotel during the relevant time period, T.H. interacted with Defendants' staff on a frequent basis, and Defendants' staff witnessed and observed

T.H., her traffickers, as well as a frequent procession of sex buyers going in and out of the subject rented rooms, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

57. T.H. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to T.H. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

58. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

59. As such, Defendants knew or should have known that T.H. was being trafficked at the Subject Hotel.

60. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included observable signs of force, coercion, and control — including Plaintiff's lobby pickups of sex buyers in the direct presence and view of the Subject Hotel's manager; the manager's own friendship with, and purchases of controlled substances from, Plaintiff's trafficker; Plaintiff's visible injuries and impairment; the large numbers of male visitors asking for Plaintiff or her trafficker at the front desk; the suspicious items — including a pistol and drugs — in the subject rooms; the removed or covered smoke detectors; the use of two (2) adjacent rooms in connection with a multi-victim operation; and the repeated booking of the subject rooms by her traffickers or at their direction. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that T.H. was being subjected to trafficking through force, fraud, and coercion.

**VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of T.H.**

61. Defendants had both actual and constructive knowledge of the trafficking of T.H. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

62. Rooms used for the trafficking of Plaintiff at Defendants' subject hotel during the relevant time period were booked, on a repeated basis, by her traffickers or at their direction, including, at times, through the Booking.com online travel agency platform using an account in Plaintiff's name.

63. Defendants rented rooms to individuals it knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

64. Franchisee Defendant, through its staff, leased the rooms used for T.H.'s trafficking, collected payment for those rooms, and interacted face-to-face with T.H. and her traffickers on a regular and repeated basis. These were not passive observations of trafficking from a distance; Franchisee Defendant was involved in the commercial transactions that provided T.H.'s traffickers with the venue used to sexually exploit T.H.

65. Beyond the room rental transactions, the manager of the Subject Hotel engaged in his own commercial dealings with Plaintiff's trafficker by purchasing controlled substances from the trafficker on the subject premises. These transactions gave Defendants' management direct, first-hand knowledge of, and a direct commercial relationship with, the traffickers' criminal enterprise operating at the Subject Hotel — knowledge imputed to Defendants.

66. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms booked by her traffickers, or at their direction, that were used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA from approximately the summer of 2018 through and inclusive of April 2025.

67. Discovery will inform whether the traffickers, or individuals at the traffickers' direction, booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

(a) under the registrant's proper legal name or a false name;

(b) whether cash, prepaid card, debit card or credit card was used at the time of respective booking or renewal; and

(c) whether staff of Defendants required for each booking that the renter show their identification.

68. Plaintiff's traffickers used proceeds derived from the sex trafficking occurring on the subject premises to continue to pay for rooms used for the trafficking at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

69. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, Franchisee Defendant continued renting the rooms used to sexually exploit Plaintiff.

70. Franchisee Defendant knew or should have known that T.H. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate T.H.'s sexual exploitation.

71. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of T.H., in ways including:

(a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

(b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

(c) choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

(d) creating an environment where the traffickers did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

72. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of T.H.

73. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued participating in the rental of the rooms used to sexually exploit victims, including T.H.

74. G6 knew or should have known that T.H. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate T.H.'s sexual exploitation.

75. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

(a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

(b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

(c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

(d) the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

(e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel;

(f) the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal;

(g) the G6 Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

(h) the G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

76. If G6 had exercised reasonable diligence when operating the Subject Hotel and in the areas where it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of T.H. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of T.H.

## VII. Defendants' ventures at the Subject Hotel.

77. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with sex traffickers at the Subject Hotel, including T.H.'s traffickers.

78. Plaintiff's traffickers repeatedly operated their sex trafficking business out of Defendants' subject hotel during the relevant time period, procuring and renewing rooms — at times two (2) adjacent rooms at once — on a repeated basis, directly or otherwise at their direction. This repeated pattern evidences a continuous business relationship between the traffickers and the Subject Hotel.

79. Franchisee Defendant's repeated rental of the rooms used for Plaintiff's trafficking at Defendants' hotel was not a standard arm's length transaction, but rather the repeated room rental transactions which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking such that said Defendant knew, or should have known, that Defendant was renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA. This continuous business relationship gives rise to the inference of a tacit agreement between Franchisee Defendant and T.H.'s traffickers to continue their mutually beneficial commercial dealings despite Franchisee Defendant's actual or constructive knowledge that the traffickers were engaged in sex trafficking.

80. Franchisee Defendant's association with the Plaintiff's sex traffickers was a venture because Plaintiff's traffickers had prior and ongoing commercial and other dealings with said Defendant at the subject hotel premises by means of rooms repeatedly procured by the traffickers, or at their direction, during the time period of Plaintiff's trafficking, and by means of the Subject Hotel manager's own commercial dealings with the trafficker, including the purchase of controlled substances from the trafficker on the premises, which said Defendant knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

81. Franchisee Defendant was engaged in a venture with Plaintiff's traffickers through said Defendant's staff, including by means of its manager's direct commercial dealings with the trafficker on the subject premises.

82. Franchisor Defendants were engaged in a venture with Plaintiff's traffickers through said Defendants' staff.

83. Relative to the subject hotel, a continuous business relationship existed between Franchisee Defendant and its respective agents, employees and staff, and Plaintiff's traffickers' sex trafficking business, in part, in that Defendant provided assistance, support, or facilitation to the Plaintiff's traffickers by repeatedly renting rooms to individuals it knew or should have known were involved in, or facilitating, sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the venture's success.

84. Relative to the subject hotel, a continuous business relationship existed between Franchisor Defendants and their respective agents, subagents, or staff and Plaintiff's traffickers' sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the Plaintiff's traffickers by repeatedly renting rooms to individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the venture's success.

85. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject

Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting the rooms used for Plaintiff's trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

### VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.

86. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and staff at the Subject Hotel, which are G6's actual agents or subagents.

87. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

88. The G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant:

(a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hotel;

(b) covered virtually all aspects of hotel operations, including internal operating functions;

(c) dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hotel; and

(d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

89. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Hotel, including:

(a) requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations;

(b) controlling training content and methods for hotel staff;

(c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections;

(m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements;

(n) controlling all marketing and prohibiting unauthorized online presence; and

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations.

90. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when branded hotels would share information with law enforcement;

(c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff or franchising agreements based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking;

(i) maintaining control over internet services at the Subject Hotel, including whether sites used to solicit sex trafficking victims would be accessible; and

(j) retaining control over housekeeping policies, including how often rooms must be entered, how rooms are to be inspected and serviced, and how staff are to respond to suspicious items or activity observed in guest rooms — the very policies implicated by what Defendants' housekeeping staff observed, or should have observed, in the rooms used to traffic Plaintiff.

91. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval;

(c) establishing and maintaining a brand-wide "do not rent" system;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

(f) controlling policies and procedures regarding check-in, payment and identity verification;

(g) collecting, retaining, monitoring, and analyzing detailed data about every guest; and

(h) requiring franchisees to use G6's property management system for virtually all aspects of room reservations and payment.

## IX. G6 Defendants are jointly responsible for the trafficking of T.H.

92. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

93. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

## X. Defendants are Jointly and Severally Liable for T.H.'s Damages.

94. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to T.H.

95. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to T.H. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA

96. T.H. incorporates all other allegations.

**COUNT I. Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants)**

97. T.H. is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

98. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including T.H.'s traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

99. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee Defendant regarding the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

100. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause T.H. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

**COUNT II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

101. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

102. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

103. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

104. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel.

105. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee.

**DAMAGES**

106. Defendants' acts and omissions, individually and collectively, caused T.H. to sustain legal damages.

107. Defendants are jointly and severally liable for all past and future damages sustained by T.H.

108. Defendants' involvement and failure, by their agents, servants, staff, and employees, to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate and competent cause and substantial factor in causing T.H.'s severe injuries in this case including, but not limited to, being the victim of sex trafficking when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being induced to engage in commercial sex with multiple sex buyers while being trafficked, and while simultaneously being under fear of severe harm if she did not comply, being repeatedly and brutally beaten, stabbed, struck in the face with a firearm, and burned with cigarettes, suffering permanent scarring and injuries requiring repeated hospital treatment, being covertly drugged and compelled to use controlled substances, and having her identification, phone, and money confiscated by her trafficker, as well as all residual injuries suffered by PTSD.

109. T.H. being sex trafficked at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to diagnosed PTSD, anxiety, and panic attacks, for which Plaintiff is treated and medicated, which in turn affects daily functioning.

110. As a direct and proximate result of Defendants' involvement, enabling, and multiple failures to act, mandate, establish, and execute anti-trafficking measures and modify their anti-trafficking efforts at the Subject Hotel, T.H. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel in violation of the TVPRA.

111. As a consequence of being sex trafficked at the Subject Hotel, T.H. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. §1591.

112. T.H. is entitled to be compensated for personal injuries and economic damages, including:

(a) Actual damages (until trial and in the future);

(b) Incidental and consequential damages (until trial and in the future);

(c) Mental anguish and emotional distress damages (until trial and in the future);

(d) Lost earnings and lost earning capacity (until trial and in the future);

(e) Necessary medical expenses (until trial and in the future);

(f) Life care expenses (until trial and in the future);

(g) Physical pain and suffering (until trial and in the future);

(h) Physical impairment (until trial and in the future);

(i) Exemplary/Punitive damages;

(j) Attorneys' fees;

(k) Costs of this action; and

(l) Pre-judgment and all other interest recoverable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Disgorgement of profits obtained through unjust enrichment;

(g) Restitution;

(h) All damages allowable under the TVPRA;

(i) Reasonable and recoverable attorney's fees;

(j) Punitive damages with respect to each cause of action;

(k) Costs of this action;

(l) Prejudgment and all other interest recoverable; and

(m) Such other and further relief to which T.H. may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 12, 2026

Respectfully submitted,

s/ Jason Byrd
Jason Byrd
THE BYRD LAW FIRM
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph Janis, Esq.
DOUGLAS AND LONDON, P.C.
1 State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501

rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS AND LONDON, P.C.
1 State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com

Attorneys for Plaintiff